**DELTA STAR, INC., Plaintiff and Counterclaim deft.,**

v.

**Andrew W. PATTON, Defendant and Counterclaim pltf.,**

v.

**The Delta Star Benefit Restoration Plan, The Delta Star Supplemental Executive Retirement Plan, The Delta Star Employee Stock Ownership Plan, and The Trustees of the Delta Star Employee Stock Ownership Plan, Add'l. counterclaim Defendants.**

No. Civ.A.96–2183.

United States District Court, W.D. Pennsylvania.

June 10, 1999.

Arthur H. Stroyd, Daniel E. Wille, John G. Ferreira, Stephen J. Del Sole, Hannah Lawrence Thompson, Reed, Smith, Shew & McClay, Pittsburg, PA, Will Barnett Fitton, Peter J. Wilson, David W. Barby, Latham & Watkins, Costa Mesa, CA, for Delta Star, Inc.

Wayne C. Holcombe, Cohen & Grigsby, Pittsburgh, PA, Robert C. Wood, Eric J. Sorenson, Jr., Edmunds & Williams, Lynchburg, VA, for Andrew W. Patton.

Mark S. Frank, Aderson, Frank & Steiner, Pittsburg, PA, Robert C. Wood, Eric J. Sorenson, Jr., Edmunds & Williams, Lynchburg, VA, for James E. Austin.

Arthur H. Stroyd, Daniel E. Wille, John G. Ferreira, Stephen J. Del Sole, Hannah Lawrence Thompson, Reed, Smith, Shew & McClay, Pittsburg, PA, for Delta Star Benefit Restoration Plan.

Arthur H. Stroyd, Daniel E. Wille, John G. Ferreira, Stephen J. Del Sole, Hannah Lawrence Thompson, Reed, Smith, Shew & McClay, Pittsburg, PA, Peter J. Wilson, Joseph M. Yaffe, Latham & Watkins, Costa Mesa, CA, for Delta Star Supplemental Executive Retirement Plan.

Arthur H. Stroyd, Daniel E. Wille, John G. Ferreira, Stephen J. Del Sole, Hannah Lawrence Thompson, Reed, Smith, Shew & McClay, Pittsburg, PA, for Delta Employee Stock Ownership Plan.

Ralph A. Finizio, Houston Harbaugh Two Chatham Center, Pittsburgh, PA, for Christian N. Pany.

### FINDINGS OF FACT

BLOCH, District Judge.

#### I. Parties

1. Plaintiff, Delta Star, Inc. (Delta Star), is a Delaware corporation engaged in the business of manufacturing medium power transformers and other electrical equipment.

2. Defendant, Andrew W. Patton (Patton), is the former President of Delta Star and the former Chairman of the Delta Star Board of Directors (Delta Star Board).

3. The additional parties to this action are: (1) the Delta Star Employee Stock Ownership Plan (Delta Star ESOP); (2) the current members of the Delta Star ESOP Board of Trustees (ESOP Board of Trustees); (3) the Delta Star Benefit Restoration Plan (BRP); and (4) the Delta Star Supplemental Executive Retirement Plan (SERP).

4. At all times relevant hereto, Patton was a participant in the Delta Star ESOP and a member of the ESOP Board of Trustees. Patton is also a beneficiary under the BRP and SERP.

#### II. Formation of Delta Star

5. Prior to its incorporation, Delta Star was a wholly-owned subsidiary of H.K. Porter Company (H.K.Porter), a large corporation with offices in Pittsburgh, Pennsylvania.

6. As H.K. Porter's subsidiary, Delta Star maintained two manufacturing plants; one in Lynchburg, Virginia, and one in Belmont, California.

7. During the late 1980's, H.K. Porter began to encounter asbestos liability problems. Rather than risk losing Delta Star as a result of such problems, H.K. Porter decided to spin-off Delta Star as a separate entity.

8. To effectuate the spin-off, H.K. Porter decided to use an employee stock ownership plan (ESOP).

9. An ESOP is a plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, that invests primarily in "qualifying employer securities," which, typically, are shares of stock in the employer that created the ESOP. 29 U.S.C. § 1107(d)(6)(A).

10. The use of an ESOP makes it possible for ESOP participants to acquire stock of the sponsoring employer, thereby

giving them an ownership interest in the employer.

11. Typically, an ESOP obtains financing from an outside source such as a bank and, as an ESOP loan is paid down, shares of the sponsoring employer's stock are released from a suspense account and allocated to the ESOP participants in accordance with a particular formula.

12. H.K. Porter initially offered the opportunity to form the Delta Star ESOP to Christian Pany (Pany). At the time, Pany was the general manager of Delta Star's Belmont, California plant.

13. While Pany was in the process of seeking financing for the Delta Star ESOP, H.K. Porter took the opportunity away from him and offered it to Patton. At the time, Patton was the Vice President of Operations for H.K. Porter's electrical division.

14. Patton accepted the offer and eventually formed the Delta Star ESOP.

15. The participants in the Delta Star ESOP consisted of all salaried employees of Delta Star from both the Lynchburg, Virginia and Belmont, California plants.

16. Once the Delta Star ESOP was formed, Patton, Pany and James Austin (Austin) were named as the sole members of the ESOP Board of Trustees. As counterpart to Pany, Austin was the general manager of the Lynchburg, Virginia plant.

17. Although Patton was advised to have at least one outside trustee appointed to the ESOP Board of Trustees, particularly, someone who was familiar with the workings of an ESOP, Patton did not want any outside trustees and, thus, none were appointed.

18. To effectuate the Delta Star ESOP's purchase of Delta Star from H.K. Porter, a new corporation called Delta Star Acquisition Corporation (Delta Star Acquisition) was formed, which was to be controlled by the Delta Star ESOP.

19. Patton obtained financing for the Delta Star ESOP through the Pittsburgh National Bank (PNB).

20. Pursuant to a commitment letter dated October 7, 1988, and a Credit Agreement dated November 23, 1988, PNB loaned a total of $8.2 million to Delta Star Acquisition. This amount consisted of the following three items: (1) a revolving credit line of $1 million; (2) a term loan in the amount of $5,133,000; and (3) a term loan in the amount of $2,067,000.

21. Thereafter, Delta Star Acquisition loaned $7.2 million of the total $8.2 million PNB loan amount to the Delta Star ESOP. This amount consisted of the proceeds from the two PNB term loans.

22. Thereafter, the Delta Star ESOP paid this $7.2 million back to Delta Star Acquisition, in exchange for approximately 98.63% of Delta Star Acquisition's stock. The remaining 1.37% of Delta Star Acquisition's stock was purchased by nine key management individuals from Delta Star; specifically, by Patton, the two general managers (Pany and Austin), the two engineers, the two accountants and the two marketing directors from the Belmont, California and Lynchburg, Virginia plants.

23. Patton convinced H.K. Porter to pay a bonus to these key management individuals to enable them to purchase the shares of Delta Star Acquisition's stock set aside for management without having to incur personal expense.

24. The total bonus from H.K. Porter was $100,000, of which Patton received the largest amount ($30,000) Patton consequently obtained the largest amount of management shares of Delta Star Acquisition's stock.

25. Once all of the shares of Delta Star Acquisition's stock had been allocated, Delta Star Acquisition paid $8.3 million to H.K. Porter. This amount consisted of the following: (1) the $7.2 million received from the Delta Star ESOP; (2) the $100,000 received from the nine key manage-

ment individuals; and (3) the $1 million revolving line of credit from PNB.

26. The amount of $8.3 million was said to represent the book value of Delta Star, plus an additional $1 million. In this regard, the book value of Delta Star was indeed listed as $7.3 million at the time of the transaction. The overall value of Delta Star, however, was much greater than $7.3 million. For example, despite their great value, the fixed assets of Delta Star were listed as having a zero value at the time of the transaction. The practical effect of this was that H.K. Porter sold Delta Star to the Delta Star ESOP for a price well below the value of the company.

27. In exchange for the $8.3 million, H.K. Porter delivered 100% of Delta Star's stock to Delta Star Acquisition, thereby rendering Delta Star a wholly owned subsidiary of Delta Star Acquisition.

28. Once the sale was complete, Delta Star Acquisition merged with Delta Star, leaving Delta Star Acquisition as the surviving corporation, and thereafter officially changed its name to Delta Star, Inc.

### III. Management of Delta Star

29. As the sole members of the ESOP Board of Trustees, with the power and authority to vote the shares of Delta Star common stock held by the Delta Star ESOP, Patton, Pany and Austin voted in favor of their election as the sole members of the Delta Star Board.

30. Attorney William Cullen, a partner with Kirkpatrick & Lockhart, LLP, periodically served as legal consultant to Delta Star throughout the relevant years.

31. Although Attorney Cullen advised Patton to have one or more outside directors serve on the Delta Star Board, Patton did not want any outside directors and, thus, none were appointed.

32. At an initial meeting of the three-member Delta Star Board, Patton was appointed Chairman and President of Delta Star and Pany and Austin were appointed Vice–Presidents. John Balsley (Balsley), the Chief Financial Officer (CFO) of Delta Star, was appointed Secretary and Treasurer of the Delta Star Board. In this capacity, Balsley was to attend board meetings and maintain the minutes book.

33. During the relevant years, Pany was in charge of the Belmont, California plant and Austin was in charge of the Lynchburg, Virginia plant. Patton maintained a separate one-room office for himself in Pittsburgh, Pennsylvania, which served as Delta Star's headquarters.

34. Because the directors were stationed in different cities, the Delta Star Board rarely had face-to-face meetings during Patton's term as President. More frequently, the Delta Star Board would hold telephone meetings or enter into unanimous consents.

35. Typically, upon Patton's request, or upon Balsley's request at Patton's direction, unanimous consent forms were prepared by Attorney Cullen. Once prepared, Attorney Cullen would forward the unsigned unanimous consent forms to Balsley, who would circulate the forms to all members of the Delta Star Board for their signatures. If signed, the unanimous consent forms were sent back to Balsley for placement in the minutes book.

### IV. Financial performance of Delta Star

36. The electrical transformer industry is cyclical in nature, in that there are periods of growth and periods of decline which affect the industry as a whole.

37. Historically, the cycle of the small to medium power electrical transformer industry is seven years—four down years and three up years. During the down years, there is a lower demand for electrical transformers, and during the up years there is a greater demand.

38. The cycle of the electrical transformer industry is determined by the construction industry in the United States.

39. During the early years of Delta Star's existence as a separate entity, it performed well financially.

40. In its first year, 1989, Delta Star reported net sales of $41,618,390 and a net income of $2,578,545.

41. In 1990, Delta Star reported net sales of $49,572,312 and a net income of $2,724,305.

42. In 1991, Delta Star's financial performance began to decline. In that year, although Delta Star's net sales rose to $59,847,343, its net income stayed somewhat flat, at $2,911,112.

43. In 1992, Delta Star's net sales dropped to $45,519,755 and its net income dropped to $2,759,229.

44. In 1993, Delta Star's net sales dropped dramatically to $27,313,080 and its net income dropped to $823,391.

45. In 1994, although Delta Star's net sales rose slightly, to $28,030,681, for the first time, it reported a loss in net income of $129,386.

46. The financial performance of Delta Star during the years 1989 through 1994 was consistent with the business cycle of the electrical transformer industry as a whole.

47. The ups and downs of Delta Star's financial performance during the years 1989 through 1994 were attributable primarily to the business cycle of the electrical transformer industry as a whole.

48. Patton's management skills and talents made, at most, a five percent difference in Delta Star's financial performance during the years 1989 through 1994.

49. Despite the fact that Delta Star had greater net sales in some years than others, Delta Star's yearly net income stayed somewhat flat throughout the years 1989 through 1994. This was due, primarily, to the fact that excess money from sales was paid out to key management individuals in the form of salary increases and bonuses.

## V. Salary increases

50. In 1989, at the time Delta Star became a separate entity, Patton's base salary was $201,400. This amount had previously been set by officials from H.K. Porter.

51. During the years 1989 through 1994, Patton unilaterally determined increases in base salaries for all senior managers, including himself.

52. The base salaries that Patton received during the years 1989 through 1994 were as follows: (1) 1989—$201,400; (2) 1990—$222,875; (3) 1991—$277,211; (4) 1992—$301,570; (5) 1993—$301,320; and (6) 1994—$301,320.

53. The procedure by which Patton caused himself and others to be paid salary increases was never approved by the Delta Star Board.

54. There were no formal documents in place which laid out the criteria which Patton considered in determining salary increases.

55. Patton did not explain or provide documentation to anyone, including the other members of the Delta Star Board, as to how he calculated any salary increases, including his own.

56. Patton did not invite input from others regarding salary increases.

57. Patton did not seek the advice or review of an independent outside consultant concerning the fairness or legality of the salary increases that he caused to be paid to himself and others, or the effect that such salary increases would have on the Delta Star ESOP or its assets.

58. Patton's average base salaries from 1991 through 1993 were above the 75th percentile of base salaries paid to CEOs of other companies in the electrical equipment industry with $60 million in sales.

59. Patton's average base salaries from 1991 through 1993 were competitive with the base salaries paid to the CEO of Kuhlman Corporation, a company much larger

than Delta Star in the electrical equipment industry.

60. Patton's average base salaries from 1991 through 1993 were at the 75th percentile of base salaries paid to CEOs of companies in the electrical equipment industry with sales of under $200 million.

61. Patton's average base salaries from 1991 through 1993 were at the 50th percentile of base salaries paid to CEOs of S & P Small Cap companies in the electrical equipment industry.

62. Patton's average base salaries from 1991 through 1993 were below the 50th percentile but above the 25th percentile of base salaries paid to CEOs of all S & P 500 companies in the electrical equipment industry.

63. Because companies in the electrical equipment industry with $60 million in sales, Kuhlman Corporation, companies in the electrical equipment industry with sales of under $200 million, S & P Small Cap companies in the electrical equipment industry and S & P 500 companies in the electrical equipment industry are all substantially larger than Delta Star, it would be reasonable to expect that the base salaries paid to the CEOs of such companies would exceed the base salaries paid to Patton.

64. The salary increases that Patton unilaterally determined during the years 1989 through 1994 benefitted Patton and resulted in a diminution in the value of Delta Star's common stock, the sole asset held by the Delta Star ESOP.

## VI. Other items of compensation

65. In addition to base salary, Patton received other items of compensation during his employment at Delta Star.

66. Patton received a meal allowance during the time that he was stationed in Pittsburgh, Pennsylvania.

67. Patton received reimbursement for a country club membership in Mansfield, Ohio, where his home was located, as well as two city club memberships in Pittsburgh, Pennsylvania.

68. Patton received reimbursement for lawn care of his Mansfield, Ohio residence.

69. Delta Star leased vehicles for Patton's use for two year periods. At the end of each two year lease, Patton was given the option to purchase the vehicles for $2,000. During his five years with Delta Star, Patton exercised this option three times and purchased two Cadillacs and a Mercedes for $2,000 each.

70. Each of these additional items of compensation was provided to Patton at his suggestion and/or direction.

## VII. Bonuses

71. In addition to salary increases and other items of compensation, Patton received bonuses during his employment at Delta Star.

72. The PNB Credit Agreement contained a document entitled Exhibit S, which discussed, *inter alia*, a proposed Annual Bonus Plan for Delta Star's officers and senior managers.

73. The proposed Annual Bonus Plan contained in Exhibit S described a formula under which an annual bonus pool for Delta Star's officers and senior managers was to be determined. The annual bonus pool was defined as equaling 40% of Delta Star's excess cash flow for any given calendar year.

74. Although a draft Annual Bonus Plan was prepared by Attorney Cullen in May, 1989, the Delta Star Board never adopted an Annual Bonus Plan similar to the one proposed in Exhibit S to the Credit Agreement.

75. At or around the time the Delta Star ESOP was formed, Attorney Cullen also prepared a document entitled "Delta Star, Inc. Incentive Compensation Procedures." This document was likewise never adopted by the Delta Star Board.

76. During the years 1989 through 1994, Patton unilaterally determined bonus

amounts to be awarded to all senior managers, including himself.

77. The bonuses which Patton received during the years 1989 through 1994 were as follows: (1) 1989—$162,000 (80% of base salary); (2) 1990—$644,000 (281% of base salary); (3) 1991—$1,040,000 (375% of base salary); (4) 1992—$700,000 (232% of base salary); (5) 1993—$180,000 (60% of base salary); and (6) 1994—$0.

78. The bonus amounts determined by Patton were taken from a bonus pool. As CFO of Delta Star, Balsley kept track of how much money was available in the bonus pool. This amount, however, was dictated unilaterally by Patton. In this regard, Patton would contact Balsley periodically and instruct him to place certain sums of money into the bonus pool.

79. Patton informed Balsley of the bonus amounts that he unilaterally determined were to be paid to senior managers. Balsley then issued checks in the stated amounts and forwarded them to Patton for his signature.

80. Bonuses were paid to senior managers at various times throughout the year, typically on a quarterly basis. In this regard, 1991 was the only year in which a fifth bonus was paid to senior managers at the end of the year.

81. Patton did not refer to the formula contained in Exhibit S to the Credit Agreement in determining the amount of money available in the bonus pool or in determining bonus amounts.

82. During the relevant years, Delta Star's senior managers received bonus payments that exceeded the amounts that would have been authorized had Patton followed the formula contained in Exhibit S to the Credit Agreement.

83. The procedure by which Patton caused himself and others to be paid bonuses was never approved by the Delta Star Board.

84. There were no formal documents in place which laid out the criteria which Patton considered in determining bonus amounts.

85. There were no predetermined targets or performance goals in place which Patton considered in determining bonus amounts. It is common for companies to have such targets and, based on a particular executive's performance in relation to those targets, to pay one bonus at the end of the year.

86. Patton did not explain or provide documentation to anyone, including the other members of the Delta Star Board, as to how he calculated bonuses, including his own.

87. Patton did not invite input from others regarding bonuses.

88. Patton did not seek the advice or review of an independent outside consultant concerning the fairness or legality of the bonuses that he caused to be paid to himself and others, or the effect that such bonuses would have on the Delta Star ESOP or its assets.

89. As a group, the Delta Star Board discussed the issue of bonuses to senior managers on only one occasion, specifically, at a board meeting held, by telephone, on December 13, 1989.

90. During the December 13, 1989 meeting, the Board resolved "that the payments to senior managers, under the Annual Bonus Plan be made in the amount of $257,000," the amount determined by Patton to have been available in the bonus pool at that time. The Board further resolved "that the allocation of this Bonus be at the discretion of the Chairman, but that he will be guided by the number of Company shares held by the senior managers."

91. Nothing was discussed or resolved during the December 13, 1989 meeting regarding the formula by which Patton was to allocate the $257,000 available in the bonus pool.

92. Nothing was discussed or resolved during the December 13, 1989 meeting

regarding the allocation of funds available in any future bonus pools.

93. Except for the minutes regarding the December 13, 1989 meeting, there are no board minutes, memoranda or correspondence reflecting board action as to the procedure by which Patton was to establish bonus amounts.

94. Scott Peterson, a representative from Ernst & Young, recommended that the Delta Star Board adopt an Annual Bonus Plan and conduct an investigation into the bonuses that had been paid during the years of Patton's presidency. When confronted with this recommendation, Patton took no action.

95. Although it is the usual practice in the industry, the Delta Star Board never established a compensation committee during Patton's term as President.

96. Patton took steps to conceal the amounts of bonuses paid to senior managers from the other officers of Delta Star, the other members of the Delta Star Board and the other members of the ESOP Board of Trustees.

97. Patton instructed Balsley that he was not to have anyone but him (Patton) sign the bonus checks.

98. Patton instructed Balsley that he was not to reveal to anyone the amounts of bonuses received by himself and others.

99. In November, 1991, an annual report regarding Delta Star's pension plans was prepared by an actuarial company. This report was to be distributed to all members of the ESOP Board of Trustees. The report was initially forwarded to Patton for his review. Upon realizing that the report contained a chart listing the total amount of compensation received by individuals in particular age groups, Patton instructed Balsley to call the actuarial company and ask that the chart be removed. Patton was concerned that, because he was the only employee over the age of 65, one of the age groups listed in the chart, his total compensation would be revealed to anyone reviewing the report. When the actuarial company refused to remove the chart from the report, Patton instructed Balsley to place the report in the company file and not forward it to either of the other members of the ESOP Board of Trustees.

100. Patton's average annual bonus payment from 1991 through 1993 was $640,000, which represented 218% of his base salary.

101. Patton's average bonus payments from 1991 through 1993 were significantly above the 75th percentile of bonuses paid to CEOs of companies in the electrical equipment industry with $60 million in sales. For those companies, the average bonus payment was 39% of base salary.

102. Patton's average bonus payments from 1991 through 1993 were significantly higher than the bonuses paid to the CEO of Kuhlman Corporation. For that company, the average bonus payment was 66% of base salary.

103. Patton's average bonus payments from 1991 through 1993 were significantly above the 75th percentile of bonuses paid to CEOs of companies in the electrical equipment industry with under $200 million in sales. For those companies, the average bonus payment was 39% of base salary.

104. Patton's average bonus payments from 1991 through 1993 were significantly above the 75th percentile of bonuses paid to CEOs of S & P Small Cap companies in the electrical equipment industry. For those companies, the average bonus payment was 70% of base salary.

105. Patton's average bonus payments from 1991 through 1993 were above the 75th percentile of bonuses paid to CEOs of all S & P 500 companies in the electrical equipment industry. For those companies, the average bonus payment was 76% of base salary.

106. Because companies in the electrical equipment industry with $60 million in sales, Kuhlman Corporation, companies in

the electrical equipment industry with sales of under $200 million, S & P Small Cap companies in the electrical equipment industry and S & P 500 companies in the electrical equipment industry are all substantially larger than Delta Star, it would be reasonable to expect that the bonuses paid to the CEOs of such companies would exceed the bonuses paid to Patton during the relevant years.

107. The bonuses that Patton unilaterally determined during the years 1989 through 1993 benefitted Patton and resulted in a diminution in the value of Delta Star's common stock, the sole asset held by the Delta Star ESOP.

### VIII. The BRP

108. In addition to salary increases, other items of compensation and bonuses, Patton also directed that the Delta Star Board adopt the BRP.

109. On April 10, 1990, the Delta Star Board adopted the BRP, retroactively effective as of January 1, 1989.

110. The BRP was retroactive so as to provide Patton with increased benefits.

111. At Patton's direction, the BRP was drafted by Ludwig & Genes, a law firm with offices in San Francisco, California.

112. Under the Delta Star ESOP, shares of Delta Star common stock were allocated to eligible employees in proportion to each employee's compensation level. These allocations were subject to certain limitations placed on the Delta Star ESOP under the Tax Code. Because of their high levels of compensation, Patton, Pany, Austin and Balsley were subject to those limitations.

113. The BRP was designed to supplement the allocations of shares of Delta Star common stock that would be made to Patton, Pany, Austin and Balsley under the Delta Star ESOP. Specifically, under the BRP, Patton, Pany, Austin and Balsley were credited with units, each of which represented the value of a share of Delta Star common stock, in an amount equal to the number of additional shares of Delta Star common stock that they would have received under the Delta Star ESOP had the allocations not been limited by the Tax Code.

114. BRP plans are often utilized by companies for purposes of satisfying executives whose compensation levels exceed Tax Code limitations.

115. The BRP that the Delta Star Board adopted, however, does not represent an average or typical design for such plans.

116. Under a typical BRP, participants are provided a number of BRP units equal to the number of additional ESOP shares that they would have received absent the Tax Code limitations.

117. Under the BRP adopted by the Delta Star Board, however, participants received BRP units which were determined by applying the actual Delta Star ESOP allocation rate to the participants' total compensation level, including salary and bonuses. The BRP was drafted in this manner at Patton's direction.

118. Because the BRP calculated BRP units for executives considering total compensation earned, Patton's high salary and bonus levels resulted in his being allocated an excessive number of BRP units.

119. Prior to its adoption, Patton did not seek the advice or review of an independent outside consultant concerning the fairness or legality of the BRP or the effect that the BRP would have on the Delta Star ESOP or its assets.

120. The adoption of the BRP benefitted Patton and resulted in a diminution in the value of Delta Star's common stock, the sole asset held by the Delta Star ESOP.

### IX. The SERP

121. In addition to salary increases, other items of compensation, bonuses, and

BRP benefits, Patton also directed that the Delta Star Board adopt the SERP.

122. On October 24, 1991, the Delta Star Board adopted the SERP, retroactively effective as of January 1, 1990.

123. The SERP was retroactive so as to provide Patton with increased benefits.

124. Attorney Cullen participated in drafting the original SERP, after collaboration with the Todd Organization, a compensation and benefits consulting group.

125. The SERP was designed to provide additional retirement benefits to Patton, Pany, Austin and Balsley, equal to a certain percentage of their single highest year of total compensation during the five calendar years prior to retirement. For Patton, this percentage was set at 50%, such amount being offset by certain retirement benefits already payable to Patton under the Delta Star ESOP, two tax-qualified Delta Star pension plans and the BRP.

126. One day after the SERP was adopted, on October 25, 1991, the Delta Star Board signed a unanimous consent amending the SERP to provide that the annual retirement benefit payable to the participants was to be the greater of: (1) the amount calculated under the original benefit formula; or (2) 20% of the highest single year of total compensation, without offsets by any other retirement benefits.

127. Attorney Cullen prepared the October 25, 1991 unanimous consent form at Patton's direction.

128. Thereafter, on December 6, 1991, the Delta Star Board signed another unanimous consent amending the SERP, this time increasing the alternative minimum benefit of 20% of the highest single year of total compensation to 25% of that amount, without offsets by any other retirement benefits.

129. Attorney Cullen prepared the December 6, 1991 unanimous consent form at Patton's direction.

130. SERP plans are often utilized by companies for purposes of satisfying executives whose compensation levels exceed the Tax Code limitations.

131. The SERP that the Delta Star Board adopted, however, does not represent an average or typical design for such plans.

132. Typically, companies providing SERPs calculate average wages earned over the last five years of service to determine the base amount for the retirement benefit. This is to level out compensation over a period of time, thus, avoiding account spikes and unusually good years. Some companies look to the employee's career average compensation and some look to the highest three years of compensation. Very few look to the single highest year of total compensation as in the case of the SERP adopted by the Delta Star Board.

133. The provision in the SERP adopted by the Delta Star Board basing benefits on the highest single year of total compensation is above competitive norms, particularly considering Patton's highest single year was 1991, when his total compensation consisted of an exceptionally large bonus.

134. During 1991, the year that the SERP was adopted, Patton paid himself bonuses totaling $1,040,000, the highest amount received during his term at Delta Star, rendering his total compensation for that year $1,317,211. Some of this amount represented a fifth bonus that Patton paid himself in December, 1991, after the SERP had been amended to provide an alternative minimum benefit of 25% of the participant's highest single year of total compensation. For Patton, the amount of this fifth bonus was $250,000.

135. Under the terms of the amended SERP, 25% of Patton's highest single year of total compensation (1991) resulted in an annual life annuity payment of $329,303. The result of the fifth bonus paid to Patton in December, 1991, was to increase the

yearly benefits payable to Patton under the SERP by $65,000.

136.  As designed, the SERP adopted by the Delta Star Board provided that a participant's benefits would vest if he or she was employed at the age of 60. Since Patton was over the age of 60 at the time the SERP was adopted, he was immediately vested in his SERP benefits.

137.  Typically, five years is the minimum number of years that an employee must work for a company before he or she is eligible to participate in a SERP. A SERP benefit typically increases with years of service, with the maximum SERP benefit not being attained until an executive has been with a company for fifteen to twenty years. It is unusual for an executive that has been with a company for only five years to be eligible for the maximum allowable SERP benefit, as in Patton's case.

138.  After its adoption, Balsley became concerned with the SERP, as designed and amended. Balsley presented Patton with alternative designs for the SERP, based upon advice received from the Todd Organization. When confronted with these alternative designs, however, Patton took no action and informed Balsley that he was not interested in changing the design of the SERP.

139.  Prior to its adoption and amendment, Patton did not actively seek the advice or review of an independent outside consultant concerning the fairness or legality of the SERP or the effect that the SERP would have on the Delta Star ESOP or its assets.

140.  The adoption of and amendment to the SERP benefitted Patton and resulted in a diminution in the value of Delta Star's common stock, the sole asset held by the ESOP.

141.  Without the ongoing SERP liability, Delta Star's net worth and future cash flow would increase.

142.  The fact that Delta Star purchased life insurance policies on key executives to help fund the SERP has no bearing on the reasonableness of the SERP. Such insurance policies are simply assets of the company, like any other asset.

## X.  Patton's retirement

143.  Patton retired from Delta Star in December, 1994.

144.  Patton remained the Chairman of the Delta Star Board until April, 1995, and thereafter remained a member of the Delta Star Board until August, 1996.

145.  Delta Star paid Patton $185,232.75 in SERP benefits following his retirement.

146.  Delta Star took possession of Patton's management shares of Delta Star stock following his retirement. Delta Star paid part of the purchase price for such shares in cash and gave Patton an Installment Promissory Note for the remaining balance.

147.  The Installment Promissory Note, signed by Balsley and dated September 6, 1995, provided that Delta Star would pay, to Patton, the principal sum of $56,221.48, plus interest, payable in four equal annual installments.

148.  The Installment Promissory Note provided that the interest rate thereunder was to be equal to the prime rate of interest in effect at PNB on the date which was thirty days prior to the anniversary date of the Installment Promissory Note in each of the four years following issuance of the Note.

149.  The Installment Promissory Note further provided that, "[i]n the event of a default of the payment of principal of, or interest on, this Note which default continues for a period of thirty (30) calender days ... the holder of this Note may declare it and interest thereon forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived."

150.  After Patton left the Delta Star Board, the new Delta Star Board members

conducted an examination into the reasonableness of the BRP and SERP as well as the underlying salary increases and bonuses that Patton caused himself to be paid during his term at Delta Star.

151. After the new members of the Delta Star Board determined that the BRP and SERP, as well as the underlying salary increases and bonuses, were excessive and unreasonable, Delta Star initiated the within action against Patton.

152. Due to the pendency of the within action, Delta Star has refused to pay the remaining balance due to Patton on the Installment Promissory Note. Likewise, Delta Star has refused to pay any further benefits to Patton under either the BRP or SERP.

## CONCLUSIONS OF LAW

### I. Claims asserted by Delta Star

#### A. Breach of fiduciary duty

1. At Count One of the Complaint, Delta Star asserts a claim against Patton for breach of fiduciary duty. Specifically, Delta Star claims that Patton breached the fiduciary duties that he owed to Delta Star by paying himself unauthorized and unreasonable salary increases and bonuses, by failing to carefully deliberate on the manner in which bonuses were calculated, and by causing the adoption of the BRP and SERP under which he was to receive unreasonable and excessive retirement benefits.

2. Because Delta Star is a Delaware corporation, Delta Star's breach of fiduciary duty claim against Patton is governed by Delaware law.

■ 3. Under Delaware law, the business and affairs of a corporation are managed by or under the direction of its board of directors. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del.1993) (*citing* 8 Del.C. § 141(a)).

4. "[T]he existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders." *Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984) (*citing Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984)).

5. Directors "have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them. Having become so informed, they must then act with requisite care in the discharge of their duties." *Cede*, 634 A.2d at 367 (*citing Aronson*, 473 A.2d at 812).

■ 6. Directors have an unyielding duty to protect the interests of the corporation and to act in the best interests of its shareholders. *Cede*, 634 A.2d at 360 (citations omitted).

■ 7. Directors have a duty to place the best interest of the corporation and its shareholders over any interest possessed by a director and not shared by the stockholders generally. *Cede*, 634 A.2d at 361 (citations omitted).

■ 8. Directors have a duty not to use the position of trust and confidence that they hold with the company to further their private interests. *Cede*, 634 A.2d at 361 (citation omitted).

■ 9. The rule that requires a director's undivided and unselfish loyalty toward the corporation and its shareholders demands that there be no conflict between the director's duties and self-interest. *Cede*, 634 A.2d at 361 (citation omitted).

■ 10. A director must act independently and without self-interest. *Cede*, 634 A.2d at 362.

■ 11. A director acts independently and without self-interest only when the director's decision is based entirely on the corporate merits of a transaction and is not influenced by personal or extraneous considerations. *Cede*, 634 A.2d at 362 (*citing Aronson*, 473 A.2d at 816; *Pogostin*, 480 A.2d at 624).

12. "[A] director who receives a substantial benefit from supporting a transac-

tion cannot be objectively viewed as disinterested or independent." *Cede,* 634 A.2d at 362.

13. "Without the guidance of a truly independent judgment, self-interested directors cannot with confidance [sic] know the right course in order to pursue it. In all events, the law, sensitive to the weakness of human nature and alert to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefit[ ] him." *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 765 (Del.Ch.1986) (*citing Gottlieb v. Heyden Chemical Corp.,* 90 A.2d 660, 663 (Del.1952)).

[8, 9] 14. Patton, in unilaterally determining his own salary increases and bonuses, and in causing the adoption of the BRP and SERP under which he was to receive substantial monetary benefits, was neither disinterested nor independent; rather, Patton was an interested party engaged in self-dealing.

15. Self-dealing transactions by corporate officers or directors are not strictly prohibited by Delaware law. Instead, Delaware law provides specific procedures that may be employed by a corporate officer or director to remove the taint that any such transaction may possess solely by reason of its self-interested character. *Merritt,* 505 A.2d at 763–64 (*citing* 8 Del.C. § 144).

16. To remove the taint of a self-dealing transaction, a corporate officer or director must establish to an independent body, whether it be a court in litigation, an independent committee of the board of directors, or a group of disinterested ratifying shareholders on full and complete information, that the transaction is fully fair. *Merritt,* 505 A.2d at 764 (citations omitted).

17. Patton did not establish to an independent committee of the Delta Star Board, or a group of disinterested ratifying shareholders, on full and complete information, that his salary increases, his bonuses and/or the BRP and SERP executive compensation plans were fully fair. Patton, therefore, must establish the complete fairness of these transactions to this Court. *Merritt,* 505 A.2d at 764 (citations omitted).

18. In unilaterally determining his own salary increases and bonuses, and in causing the adoption of the BRP and SERP under which he was to receive substantial monetary benefits, Patton did not act with complete fairness to Delta Star.

19. The salary increases and bonuses that Patton unilaterally paid to himself were unreasonable.

20. The retirement benefits that Patton was to receive under the BRP and SERP are unreasonable. Such benefits are unreasonable not only because of the excessive underlying salary increases and bonuses which Patton unilaterally paid to himself, but also because of the designs of the plans and the benefit formulas contained therein.

21. Patton breached the fiduciary duties that he owed to Delta Star by unilaterally paying himself salary increases and excessive bonuses which bore no reasonable relationship to his services and to his contributions to the financial performance of Delta Star.

22. Patton breached the fiduciary duties that he owed to Delta Star by causing the adoption of the BRP and SERP under which he was to receive significant retirement benefits which bore no reasonable relationship to his services and to his contributions to the financial performance of Delta Star.

23. Patton breached the fiduciary duties that he owed to Delta Star by failing to carefully consider the manner in which salary increases and bonuses were determined with the corporation and its shareholders' best interests in mind, and by failing to carefully consider the adop-

tion of the BRP and SERP with the corporation and its shareholders' best interests in mind. *Cede*, 634 A.2d at 367 (*citing Aronson*, 473 A.2d at 812).

■ 24. Patton breached the fiduciary duties that he owed to Delta Star by using the position of trust and confidence that he held as a member of the Delta Star Board to further his own private interests. *Cede*, 634 A.2d at 361 (citation omitted).

■ 25. Patton breached the fiduciary duties that he owed to Delta Star by engaging in self-dealing and failing to act in the best interests of Delta Star and its shareholders. *Cede*, 634 A.2d at 360 (citations omitted).

■ 26. A self-dealing fiduciary may be required to respond in damages or with any other appropriate remedy if a transaction is found to be not an entirely fair one to the corporation or its shareholders, as here. *Merritt*, 505 A.2d at 764.

■ 27. Although, under traditional Delaware law, officers and directors were not entitled to recover any compensation whatsoever for their services to the company if such compensation was not authorized by a group of disinterested directors or officers, as here, Delaware courts now recognize a right to recover under a theory of quantum meruit where an officer or director has fixed his own compensation. *Technicorp International II, Inc. v. Johnston*, No. 5084, 1997 WL 538671, at *14–15 (Del.Ch. August 25, 1997) (*citing Lofland v. Cahall*, 118 A. 1 (Del.1922)).

28. The burden of establishing the reasonableness of the compensation received in connection with a self-dealing transaction, and thus, the entitlement to a recovery under the doctrine of quantum meruit, is on the recipient. *Wilderman*, 315 A.2d at 615 (citations omitted).

■ 29. Patton is entitled to recover the reasonable value of his services to Delta Star on the basis of quantum meruit if he is able to demonstrate each of the following elements: (1) that he provided services as an officer of Delta Star with the understanding that he would be compensated; (2) that Delta Star benefitted from those services and would be unjustly enriched if he was not compensated; and (3) that he did not grant himself excessive compensation to unjustly enrich himself. *Technicorp*, 1997 WL 538671, at *15.

■ 30. In this case, Patton provided services as President of Delta Star·and, to an extent, Delta Star benefitted from those services. However, the actions taken by Patton in unilaterally awarding himself unreasonable salary increases and excessive bonuses, and in causing the adoption of the BRP and SERP under which he was to receive unreasonable retirement benefits, were clearly taken in an effort to unjustly enrich himself. Because of this, Patton is not entitled to recover the reasonable value of his services to Delta Star under the doctrine of quantum meruit. *Technicorp*, 1997 WL 538671, at *15.

### B. Corporate waste

31. At Count Two of the Complaint, Delta Star asserts a claim against Patton for corporate waste. Specifically, Delta Star claims that, in exchange for the compensation that Patton paid himself during his term as President and Chairman of the Delta Star Board, Delta Star received a consideration so inadequate that no person of ordinary, sound business judgment would deem it worth such compensation, thus, amounting to a waste of corporate assets.

32. Because Delta Star is a Delaware corporation, Delta Star's corporate waste claim against Patton is governed by Delaware law.

■ 33. Under Delaware law, a claim for corporate waste is based upon the diversion of corporate assets for improper or unnecessary purposes. *Michelson v. Duncan*, 407 A.2d 211, 217 (Del.1979).

34. "A waste entails an exchange of corporate assets for consideration so dis-

proportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.Ch.1997) (citations omitted).

35. To prevail on its claim of corporate waste, Delta Star must prove that Patton caused the corporation to effect a transaction on terms that no person of ordinary, sound business judgment could conclude represent a fair exchange. *Steiner v. Meyerson*, No. Civ.A. 13139, 1995 WL 441999, at *1 (Del.Ch. July 19, 1995) (*citing Saxe v. Brady*, 184 A.2d 602 (Del.Ch.1962)).

36. Although directors are given wide latitude in making business judgments, they are bound to act out of fidelity and honesty in their roles as fiduciaries and not commit acts of waste. For instance, directors may not, simply because of their position, "by way of excessive salaries and other devices, oust the minority of a fair return upon its investment." *Michelson*, 407 A.2d at 217 (citation omitted).

37. Patton committed corporate waste by awarding himself salary increases and bonuses which bore no reasonable relationship to his services and to his contributions to the financial performance of Delta Star.

38. Patton committed corporate waste by causing the adoption of the BRP and SERP plans under which he was to receive significant retirement benefits which bore no reasonable relationship to his services and to his contributions to the financial performance of Delta Star.

39. No person of ordinary, sound business judgment could conclude that the excessive salary increases and bonuses that Patton caused himself to be paid during the relevant years represented a fair exchange. *Steiner*, 1995 WL 441999, at *1.

40. No person of ordinary, sound business judgment could conclude that the adoption of the unreasonably designed BRP and SERP, under which Patton was to receive an unreasonable amount of retirement benefits, represented a fair exchange. *Steiner*, 1995 WL 441999, at *1.

### C. Damages under Delaware law

41. The only compensation authorized to be paid to Patton throughout his term at Delta Star was his original base salary of $201,400, as set by officials from H.K. Porter in 1989.

42. All salary increases and bonuses received by Patton in excess of his original base salary were unauthorized and represented a breach of the fiduciary duties that Patton owed to Delta Star, as well as a waste of Delta Star's corporate assets, and, because Patton is not entitled to a recovery of any such compensation under the doctrine of quantum meruit, such amounts must be returned to Delta Star in full.

43. In this regard, Patton must return the following amounts to Delta Star: (1) 1989—$162,000; (2) 1990—$665,475; (3) 1991—$1,115,811; (4) 1992—$800,170; (5) 1993—$279,920; and (6) 1994—$99,920. Therefore, the total amount that Patton must return to Delta Star for the unauthorized salary increases and bonuses that he awarded himself in excess of his original base salary during the years 1989 through 1994 is $3,123,296.

44. Because the adoptions of the BRP and SERP were unauthorized and represented a breach of the fiduciary duties that Patton owed to Delta Star, as well as a waste of Delta Star's corporate assets, such plans are hereby rescinded as of the dates that they were adopted.

45. All retirement benefits already paid to Patton under the SERP must be returned to Delta Star. In this regard, the total amount that Patton must return to Delta Star for SERP benefits already paid is $185,232.75.

46. All future benefits that would have been paid to Patton under the BRP and SERP must be forfeited.

*II. Claims asserted by the Delta Star ESOP and the current members of the ESOP Board of Trustees*

*A. Breach of fiduciary duty*

47. At Count One, the Delta Star ESOP and the current members of the ESOP Board of Trustees claim that Patton breached the fiduciary duties that he owed to the Delta Star ESOP as a member of the ESOP Board of Trustees, in violation of ERISA, 29 U.S.C. § 1104, by voting the shares of Delta Star common stock held by the Delta Star ESOP in favor of his retention as a member of the Delta Star Board, and by failing to take action as a member of the ESOP Board of Trustees to remove himself from the Delta Star Board or otherwise prevent the payment of excessive and unreasonable compensation and retirement benefits to himself.

48. The Delta Star ESOP is a plan governed by the terms and provisions of ERISA, 29 U.S.C. § 1001 *et seq.*

49. As a member of the ESOP Board of Trustees, Patton acted as a fiduciary within the meaning of ERISA and, thus, was governed by the provisions set forth therein.

50. The provisions of ERISA provide that an ESOP trustee shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries. 29 U.S.C. § 1104(a)(1)(A)(i).

51. Indeed, an ESOP trustee has an unwavering duty to make decisions with single-minded devotion to the ESOP participants. *Morse v. Stanley,* 732 F.2d 1139, 1145 (2d Cir.1984).

52. An ESOP trustee has a duty to exclude all selfish interest and all considerations of the interests of third persons in carrying out his duties. *McMahon v. McDowell,* 794 F.2d 100, 110 (3d Cir.) (citations omitted), *cert. denied,* 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986).

53. The provisions of ERISA further provide that an ESOP trustee shall discharge his duties with respect to a plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. § 1104(a)(1)(B).

54. Although ERISA does not expressly bar an ESOP trustee from simultaneously serving as director or officer of the sponsoring employer, ERISA does not sanction any derogation from the strict fiduciary requirements imposed upon that ESOP trustee. *McMahon,* 794 F.2d at 110 (citation omitted).

55. An ESOP trustee who also serves as an officer or director of the sponsoring corporation has a duty to act with caution in areas of potential conflicts of interest. *Deak v. Masters, Mates and Pilots Pension Plan,* 821 F.2d 572, 580 (11th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

56. Indeed, an ESOP trustee must make an intensive independent investigation into the basis for a decision which presents a potential conflict of interest. *Walsh v. Northrop Grumman Corp.,* 871 F.Supp. 1567, 1572 (E.D.N.Y.1994) (citations omitted).

57. An ESOP trustee has a duty to avoid placing himself in a position where his acts as an officer or director of the sponsoring corporation will prevent his ability to function with the complete loyalty to the ESOP participants demanded of him as an ESOP trustee. *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

58. "Although officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude

best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves, their decisions must be made with an eye single to the interests of the participants and beneficiaries." *Donovan*, 680 F.2d at 271 (citations omitted).

■ 59. An ESOP trustee who also serves as an officer or director of the sponsoring employer can be charged with knowledge of any improper actions that he took as an officer or director, and his failure to act prudently on the basis of that knowledge violates the fiduciary duties that he owes as an ESOP trustee. *Canale v. Yegen*, 782 F.Supp. 963, 968 (D.N.J. 1992).

■ 60. An ESOP trustee has a duty to bring a derivative action if he is aware that the officers and directors of the sponsoring employer have breached the fiduciary duties that they owe to their shareholders; that this would require the ESOP trustee to bring suit against himself does not relieve him of this duty under ERISA. *Atwood v. Burlington Indus. Equity, Inc.*, No. 2:92CV00716, 1994 WL 698314, at *9 (M.D.N.C. August 3, 1994) (citation omitted).

■ 61. Patton breached the fiduciary duties that he owed as an ESOP trustee by placing himself in a position where his acts as an officer and director of Delta Star prevented his ability to function with complete loyalty to the ESOP participants. *Donovan*, 680 F.2d at 271.

■ 62. Patton breached the fiduciary duties that he owed as an ESOP trustee by failing to recognize the conflict of interest that existed between his duty of loyalty to the participants of the Delta Star ESOP, and his personal financial interest in receiving unreasonable and unauthorized salary increases and bonuses and unreasonable retirement benefits under the BRP and SERP executive compensation plans.

63. Patton breached the fiduciary duties that he owed as an ESOP trustee by failing to recuse himself or resign from the ESOP Board of Trustees in favor of a neutral party who could manage the assets of the Delta Star ESOP in an independent and prudent manner. *Donovan*, 680 F.2d at 271–72.

■ 64. Patton breached the fiduciary duties that he owed as an ESOP trustee by acting to benefit his own interests, as opposed to the interests of the ESOP participants. *Herdrich v. Pegram*, 154 F.3d 362, 371 (7th Cir.1998).

■ 65. Patton breached the fiduciary duties that he owed as an ESOP trustee by failing to conduct an independent investigation into the improper and self-dealing acts taken by himself as an officer and director of Delta Star. *Donovan*, 680 F.2d at 271.

■ 66. Patton breached the fiduciary duties that he owed as an ESOP trustee by failing to protect the assets of the Delta Star ESOP from loss or dissipation as a result of the improper actions that he took as an officer and director of Delta Star. *Canale*, 782 F.Supp. at 968–69.

■ 67. Patton breached the fiduciary duties that he owed as an ESOP trustee by concealing material information from the other members of the ESOP Board of Trustees, thus, preventing their ability to act knowingly on behalf of the Delta Star ESOP.

■ 68. The acts underlying Patton's breaches of the fiduciary duties that he owed to Delta Star as a member of the Delta Star Board formed the basis of shareholder claims or other actions that could have been brought by the Delta Star ESOP, and Patton's failure to take such actions as an ESOP trustee, or to appoint an independent third party to consider whether to take such actions, was a breach of his fiduciary duties to the Delta Star ESOP. *Atwood*, 1994 WL 698314, at *9.

69. Patton's actions in breaching the fiduciary duties that he owed as an ESOP trustee resulted in a diminution in the value of the assets held by the Delta Star ESOP, to wit, the Delta Star common stock.

### B. Self-dealing

70. At Count Two, the Delta Star ESOP and the current members of the ESOP Board of Trustees claim that Patton engaged in selfdealing, in violation of ERISA, 29 U.S.C. § 1106, by voting the shares of Delta Star's common stock held by the Delta Star ESOP in favor of his retention as a member of the Delta Star Board, thereby enabling him to pay himself excessive and unreasonable compensation and retirement benefits under the BRP and SERP.

71. The provisions of ERISA provide that a fiduciary with respect to an ERISA plan shall not deal with the assets of the plan in his own interest or for his own account and shall not in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries. 29 U.S.C. § 1106(b).

72. Patton engaged in self-dealing actions as an ESOP trustee by dealing with the assets of the Delta Star ESOP in his own interest, as opposed to the interests of the ESOP participants. *Herdrich,* 154 F.3d at 371 (citation omitted).

73. Patton's self-dealing actions as an ESOP trustee resulted in a diminution in the value of the assets held by the Delta Star ESOP, to wit, the Delta Star common stock.

### C. Damages under ERISA

74. An ESOP trustee who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries under ERISA shall be personally liable to make good to the plan any losses resulting from each breach, and to restore to the plan any profits that the ESOP trustee made through use of the assets of the plan, and shall be subject to such other equitable or remedial relief as the Court may deem appropriate. 29 U.S.C. § 1109.

75. The Court has already ordered that Patton repay, to Delta Star, all unauthorized salary increases and bonuses that he awarded himself during his term at Delta Star in excess of his original base salary of $201,400. *See supra,* Conclusions of Law, ¶ 43.

76. The Court has already rescinded the BRP and SERP as of the dates that they were adopted and ordered Patton to forfeit, to Delta Star, all past and future retirement benefits that he would have received thereunder. *See supra,* Conclusions of Law, ¶¶ 44–46.

77. Any losses that the Delta Star ESOP may have suffered as a result of the breaches of the fiduciary duties that Patton owed as an ESOP trustee and/or Patton's self-dealing acts in violation of ERISA have, therefore, been fully restored.

78. The Delta Star ESOP shall calculate the amount of damages suffered by individual retirees of the Delta Star ESOP due to the diminution in the value of Delta Star's common stock as a result of Patton's conduct. Once said amount has been calculated, Delta Star shall pay said amount to the Delta Star ESOP, from the amount ordered to be paid to it by Patton in this case. The Delta Star ESOP shall then pay to the individual retirees of the Delta Star ESOP the additional benefits that were not paid to them under the Delta Star ESOP as a result of Patton's conduct.

### III. Claims asserted by Patton

### A. Claim under the Installment Promissory Note

79. At Count One, Patton asserts a claim against Delta Star for breach of contract, based upon its failure to pay

Patton the remaining balance due on the Installment Promissory Note dated September 6, 1995.

80. To prevail on his breach of contract claim against Delta Star under Delaware law, Patton much establish each of the following elements: (1) that a contractual obligation existed between himself and Delta Star; (2) that Delta Star breached that contractual obligation; and (3) that he suffered damages as a result thereof. *Fitzgerald v. Cantor*, No. C.A. 16297–NC, 1998 WL 842315, at *1 (Del.Ch. Nov.6, 1998).

81. In this case, the Installment Promissory Note dated September 6, 1995 represented a contractual obligation between Delta Star and Patton. By failing to pay Patton the remaining balance of the Installment Promissory Note, plus interest, Delta Star has breached its contractual obligations and Patton has suffered damages as a result thereof. *Fitzgerald*, 1998 WL 842315, at *1.

82. Patton is entitled to the remaining principal balance owed to him under the Installment Promissory Note, plus interest.

83. The amounts that Patton has been ordered to return to Delta Star in this case shall, therefore, be offset by the remaining principal balance owed to him under the Installment Promissory Note, in the amount of $56,221.48, plus interest at the rate set forth in the Installment Promissory Note and in accordance with applicable law.

### B. Claims under the BRP

84. At Count Two, Patton asserts a claim against the BRP, pursuant to ERISA, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the BRP.

85. At Count Three, Patton asserts a claim against Delta Star, pursuant to ERISA, based upon its alleged breach of fiduciary duty in connection with the non-payment of benefits to Patton under the BRP.

86. At Count Four, Patton asserts an alternative claim against Delta Star for breach of contract, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the BRP.

87. At Count Five, Patton asserts an alternative claim against Delta Star for unjust enrichment and for a constructive trust, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the BRP.

88. Because the Court has rescinded the BRP as of the date of its adoption and ordered that Patton forfeit all past and future benefits thereunder, *see supra*, Conclusions of Law, ¶¶ 44–46, Patton's claims at Counts Two through Five are moot.

### C. Claims under the SERP

89. At Count Six, Patton asserts a claim against the SERP, pursuant to ERISA, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the SERP.

90. At Count Seven, Patton asserts a claim against Delta Star, pursuant to ERISA, based upon its alleged breach of fiduciary duty in connection with the non-payment of benefits to Patton under the SERP.

91. At Count Eight, Patton asserts an alternative claim against Delta Star for breach of contract, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the SERP.

92. At Count Nine, Patton asserts an alternative claim against Delta Star for unjust enrichment and for a constructive trust, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the SERP.

93. Because the Court has rescinded the SERP as of the date of its adoption and ordered that Patton forfeit all past and future benefits thereunder, *see supra*,

Conclusions of Law, ¶¶ 44–46, Patton's claims at Counts Six through Nine are moot.

### D. Claim for failure to comply with request for information

94. At Count Ten, Patton asserts a claim against the current members of the ESOP Board of Trustees, pursuant to ERISA, based upon their alleged failure to comply with Patton's request for information.

95. Because Patton failed to present any evidence whatsoever in support of this particular claim at trial, the Court finds that such claim has effectively been waived.

### E. Claims under the Delta Star ESOP

96. At Count Eleven, Patton asserts a claim against the Delta Star ESOP, pursuant to ERISA, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the Delta Star ESOP.

97. At Count Twelve, Patton asserts a claim against the current members of the ESOP Board of Trustees, pursuant to ERISA, based upon their alleged breach of fiduciary duty in connection with the nonpayment of benefits to Patton under the Delta Star ESOP.

98. At Count Thirteen, Patton asserts an alternative claim against Delta Star for breach of contract, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the Delta Star ESOP.

99. At Count Fourteen, Patton asserts an alternative claim against Delta Star for unjust enrichment and for a constructive trust, based upon its failure to pay benefits to Patton that he is allegedly entitled to under the Delta Star ESOP.

100. To the extent that Counts Eleven through Fourteen are based on Delta Star's failure to pay the remaining balance due on the Installment Promissory Note dated September 6, 1995, such claims have already been resolved by this Court. *See*

*supra*, Conclusions of Law, ¶¶ 79–83. To the extent that such claims are not based on Delta Star's failure to pay the remaining balance due on the Installment Promissory Note, however, the Court finds that such claims have effectively been waived because Patton failed to present any evidence whatsoever in support of these particular claims at trial.

### F. Claim for director's fees and expenses

101. At Count Fifteen, Patton asserts a claim against Delta Star for breach of contract, based upon its alleged failure to pay, to Patton, certain director's fees, expenses and automobile lease payments that he is allegedly entitled to under contract.

102. Because Patton failed to present any evidence whatsoever in support of this particular claim at trial, the Court finds that such claim has effectively been waived.

### G. Claim for indemnification against Delta Star

103. Patton asserts a claim for indemnification against Delta Star on the two ERISA claims asserted against him by the Delta Star ESOP and the current members of the ESOP Board of Trustees.

104. The Delta Star ESOP plan documents provide that Delta Star will indemnify a member of the ESOP Board of Trustees, to the extent permitted by law, against any personal liability or expense resulting from his service on the ESOP Board of Trustees, except such liability or expense as may result from his own willful misconduct.

105. Indemnification is prohibited by law in this case. Indeed, ERISA prohibits, as being against public policy, any agreement that purports to relieve a fiduciary of responsibility or liability under ERISA for either breach of fiduciary duty or self-dealing. *Moore v. Williams*, 902 F.Supp. 957, 966 (N.D.Iowa 1995) (*citing*

29 U.S.C. § 1110(a)). *See also Donovan v. Cunningham,* 541 F.Supp. 276, 289 (S.D.Tex.1982) (holding that, because an ESOP owns a substantial portion of the sponsoring company's stock, it would be inconsistent with the intentions of ERISA to allow a trustee who has breached his fiduciary duties to the ESOP to be indemnified by the sponsoring company where the ESOP would indirectly bear the financial burden), *affirmed in part, vacated in part, reversed in part on other grounds,* 716 F.2d 1455 (5th Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

106. Even so, Patton's liability under ERISA to the Delta Star ESOP and the current members of the ESOP Board of Trustees in this case was clearly the result of his own willful misconduct, thus, taking him outside the scope of the indemnification provision contained in the Delta Star ESOP plan documents.

107. Patton is not entitled to indemnification from Delta Star on the two claims asserted against him under ERISA by the Delta Star ESOP and the current members of the ESOP Board of Trustees in this case.