**John S. PEREIRA, as Trustee of Trace International Holdings, Inc. and Trace Foam Sub, Inc., Plaintiff,**

v.

**Marshall S. COGAN, Saul S. Sherman, Andrea Farace, Frederick Marcus, Robert H. Nelson, Philip Smith, Karl Winters, Tambra King Defendants.**

**No. 00 CIV. 619 RWS.**

United States District Court, S.D. New York.

Sept. 25, 2001.

LeBoeuf, Lamb, Greene, & MacRae, L.L.P., New York City, By John P. Campo, Esq., Theodore J. Fischkin, Esq., Amy S. Zabetakis, Esq., of Counsel, for Plaintiff.

Salomon Green & Ostrow, P.C., Attorneys for Defendant Marshall S. Cogan, New York, By Chester B. Salomon, Of Counsel, Swidler Berlin Shereff Friedman, LLP, Attorneys for Defendants Andrea Farace, Saul S. Sherman, and Frederick Marcus, New York, By Shalom Jacob, Esq., Of Counsel, Piper Marbury Rudnick & Wolfe, LLP, Attorneys for Defendants Robert H. Nelson, Philip Smith, Karl Winters, and Tambra King, New York, By Robert A. Meister, Esq., Of Counsel, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiff John S. Pereira as Trustee (the "Trustee") of Trace International Holdings, Inc. and Trace Foam Sub, Inc. (together, "Trace") has moved for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, against defendant Marshall S. Cogan ("Cogan"), holding Cogan liable on eight separate promissory notes, in the aggregate principal amount of about $14.3 million. The motion also seeks to dismiss Cogan's two affirmative defenses asserting unrelated offset claims against the notes. For the reasons stated, the motion is granted.

### Parties and Prior Proceedings

Certain of the parties and prior proceedings are described in this Court's opinion of March 8, 2001, familiarity with which is presumed. *Pereira v. Cogan*, No. 00 Civ. 619, 2001 WL 243537 (S.D.N.Y., Mar. 8, 2001) (the "March 8, 2001 Opinion").

Trace is a Delaware corporation. Trace and its subsidiary, Trace Foam Sub., Inc., filed petitions under Chapter 11 of the Bankruptcy Code on July 21, 1999. The cases were converted to proceedings under Chapter 7 on January 24, 2000. The Trustee was appointed on January 25, 2000.

Cogan was the majority common stockholder of Trace, as well as its Chief Executive Officer and Chairman of its Board of Directors.

The instant motion was filed on April 23, 2001, and was marked fully submitted on June 6, 2001.

*Facts*

The following facts, which pertain to the Trustee's motion for partial summary judgment, are drawn from the parties' Rule 56.1 Statements and other submissions and, as required, are construed in the light most favorable to Cogan.

Between 1995 and 1998, Cogan engaged in a series of borrowings from Trace and executed seven promissory notes evidencing his obligation to repay these loans. Cogan denies having executed an eighth promissory note that the Trustee alleges was also executed. The first four notes, in the aggregate principal sum of $2,752,000, were executed on various dates in 1995–96 and were all due on December 31, 1999. The remaining notes had due dates of December 31 of 2001, 2002 and 2003. These notes were in the aggregate principal amount of $7,815,712.52. The disputed note, allegedly executed on May 1, 1998, was in the amount of $3,722,000, with a due date of December 31, 2003. Cogan disputes having executed the May 1, 1998 note on the grounds that it is not his signature on the form, he did not authorize anyone to sign it for him and the note was, in any event, superseded by a nonrecourse promissory note executed February 19, 1999, after the error of the May 1, 1998 note was discovered.

Under Delaware General Corporation Law, Sections 170 and 173, (8 Del. C. §§ 170, 173) Trace was permitted to pay dividends "only" out of its "surplus" (as defined in Sections 154 and 244 of the Delaware Code (8 Del. C. §§ 170, 173)) or net income. Cogan admitted in writing, shortly before execution of the nonrecourse note, that Trace lacked the requisite "surplus"; Cogan was also then in receipt of advice from a prominent law firm that Trace "would not be able to pay ... dividends"; and had negative earnings.

The aggregate principal amount of the seven notes, exclusive of the disputed May 1, 1998 note, is $10,567,712.52.

All the notes require that, on December 31 of each year, Cogan pay interest in arrears at the rate of nine percent per annum. Under each note, a failure to make an interest payment is an event of default, affording Trace (and now its Trustee) to declare the unpaid principal immediately due and payable, subject to providing Cogan with notice and an opportunity to cure.

Cogan is in default on all of the notes. On the first four notes, Cogan defaulted by failing to pay the principal sums due December 31, 1999 (as well as all interest installments due since December 31, 1998). On the remaining notes, Cogan's obligations have been accelerated, since Cogan defaulted in paying the interest installments due December 31, 1998 and 1999 and did not cure this default after notice given by the Trustee.

### The Alleged Offsets

#### 1997 Renewal of the 1987 Employment Agreement

Cogan contends that he is entitled to a $4.7 million offset, based on compensation allegedly due to him under a 1987 employment agreement (the "1987 Agreement"), as renewed in 1997. Of this sum, $3.6 million relates to contractual severance allegedly due because of the termination of his employment by reason of Trace's bankruptcy, and $1.1 million relating to the reduction of his contractual compensation prior to Trace's Chapter 11 filing. This overall claim presumes the validity of the 1997 renewal of the 1987 Agreement.

The 1987 agreement, as originally executed, August 5, 1987, provided for Cogan's employment as Chairman and CEO for a 10–year "Initial Term" through August 4, 1997. During such initial term, Cogan's annual compensation, pursuant to the agreement, consisted of (a) a minimum base annual salary of $2.4 million "or such higher amount as the Board may from time to time determine" and (b) an annual bonus "in such cash amount as the Board may from time to time determine."

The 1987 Agreement provided for four additional 10–year "Renewal Terms," spanning the period from August 4, 1997 to August 4, 2037. Under the 1987 Agreement, each of these Renewal Terms would occur automatically unless the Board, by a three-quarters vote of its entire membership, affirmatively declined to renew the Agreement or Cogan himself elected not to renew the Agreement.

When the 1987 Agreement was first up for renewal in 1997, the Board, controlled by Cogan according to the Trustee, did not address the propriety of continuing this agreement; nor did Cogan elect not to renew the agreement. Accordingly, it was automatically renewed for another 10–year period term through August 4, 2007.

Once the 1997–2007 Renewal Term began, the Agreement severely penalized Trace in the event of early termination or other diminution of Cogan's privileges, irrespective of whether such actions were justified. For example, if the Board terminated Cogan *for cause,* the Agreement guaranteed that he would continue to receive his salary for another 5 years. Since Cogan's annual salary had risen to $3.6 million, the Agreement obligated Trace to pay Cogan $18 million even if he was terminated for cause. If Cogan terminated the Agreement for "Good Reason," he would be entitled, *inter alia,* to the greater of (a) the present value of his salary—$3.6

million—for the remainder of the Renewal Term or the present value of 5 years' salary. Among other things, "Good Reason," under the Agreement, included (i) any failure to re-elect Cogan to the Board; (ii) any reduction in his base salary or the failure to increase it each year on a percentage basis comparable to that applied to other executive officers; (iii) any significant change in the nature or scope of his authorities, powers, functions or duties, or the assignment to Cogan of any duties "inconsistent with his ... status," or any removal or failure to reelect him to office.

In view of the financial penalties and the terms of the "Good Reason" standard, Cogan's renewal of the Agreement effectively immunized himself from any disciplinary or supervisory oversight by the Board during the next ten years, irrespective of performance.

Cogan's total compensation in 1997 and 1998 from Trace and its affiliates was $5.6 million and $5.8 million, respectively.

### *The 1985 Employment Agreement Offset*

The 1987 Agreement contained the following merger clause canceling and superseding all prior agreements relating to the same "subject matter":

27. *Prior Agreements.* Any and all agreements relating to the subject matter hereof previously entered into between the Corporation and Mr. Cogan are hereby mutually terminated and canceled, and each of the parties mutually releases and discharges the other from any and all obligations and liabilities whatsoever existing under it by reason of any such agreements, it being the intention of the Corporation and Mr. Cogan that this Agreement shall supersede and be in place of any and all prior agreements or understandings between them.

However, Cogan claims a $12 million offset, for alleged severance, retirement and death benefits, under a 1985 Defined Benefit Deferred Compensation and Salary Continuation Agreement (the "1985 Agreement").

The Trustee does not seek a determination of $9.8 million in additional offsets asserted by Cogan in his Answer.

### The Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548.

### Under These Authorities, Summary Judgment is Appropriate as to the Issues Relating to the Seven Uncontested Notes

■ Cases seeking recovery on promissory notes are particularly suitable for disposition via summary judgment, as the moving party need merely establish the absence of a genuine issue as to execution and default. *Banco Popular North America v. Austin Bagel Co.*, 99 Civ. 11252, 2000 WL 669644, at *2, 2000 U.S. Dist. Lexis 6979, at *6–7 (S.D.N.Y. May 23, 2000); *AAI Recoveries v. Pijuan*, 13 F.Supp.2d 448, 450 (S.D.N.Y.1998).

■ When, as here, the Trustee has made out a *prima facie* case entitling him to summary judgment on the notes, the

burden shifts to Cogan to present competent evidence establishing a genuine issue for trial. 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, Fed. Prac. and Proc., § 2727 (3d ed.1998); Fed.R.Civ.P. 56(e). Cogan cannot meet this burden.

As to seven of the eight notes, in the aggregate principal sum of about $10.6 million, Cogan does not contest the execution, the terms, or the fact that they are unpaid or overdue. The only issue regarding these seven notes is whether the offsets claimed by Cogan preclude the entry of summary judgment on those notes.

■ Offset claims do not bar summary judgment on promissory notes or other payment obligations, unless such obligations and the offset claims involve contractually "dependent" promises. *Omark Indus. v. Lubanko Tool Co.*, 266 F.2d 540, 541 (2d Cir.1959); *Greenblatt v. Prescription Plan Servs. Corp.*, 783 F.Supp. 814, 823 (S.D.N.Y.1992); *Schroeter v. Ralph Wilson Plastics, Inc.*, 49 F.R.D. 323, 326–27 (S.D.N.Y.1969) (entering summary judgment on loan indebtedness despite antitrust offset claims in a greater alleged amount); *Coleman Co. v. Hlebanja*, 1997 WL 13189, at *5–9, 1997 U.S. Dist. LEXIS 225, at *18–25 (S.D.N.Y.1997), and cases cited therein; *Inner City Telecomm. Network v. Sheridan Broad. Network, Inc.*, 260 A.D.2d 257, 257, 688 N.Y.S.2d 534 (1st Dept.1999).

■ Cogan's offset claims, concerning his employment agreements with Trace, are unrelated to his indebtedness on the notes. The notes and Cogan's employment agreements do not involve "dependent" promises because they contain no language to that effect, they were not part of the same transaction(s), and were executed many years apart. *Coleman*, 1997 WL 13189, at *5–9, 1997 U.S.Dist. LEXIS 225 at *18–25; *Inner City Telecomm. Network*, 260 A.D.2d at 257; U.C.C. §§ 3–119(1), 3–413(1) (Unless note is modified

by written agreement "executed as a part of the same transaction," maker is bound to "pay the instrument according to its tenor ...."). On similar facts, a corporation was granted summary judgment on a promissory note executed in favor of a former employee, even thought the defendant asserted a counterclaim for severance in an amount greater than his loan. *Chemetron Corp. v. Cervantes*, 92 F.R.D. 26, 29–31 (D.P.R.1981).

Unrelated offset claims may be relevant only at the point when the Court considers whether to render final and enforceable a previously granted summary judgment, pursuant to Rule 54(b), Fed.R.Civ.P. *Schroeter v. Ralph Wilson Plastics, Inc.*, 49 F.R.D. 323, 326 (S.D.N.Y.1969). Whether such a final and enforceable judgment would be appropriate in light of any valid, outstanding offsets is an argument for another day. The arguments put forward by Cogan regarding the Bankruptcy Code (see below) are premature because they are directed to whether Cogan should now *pay* his notes to the Trustee, which is a Rule 54(b) issue. At that stage, the Court may take appropriate action, including, if appropriate, requiring Cogan to deposit money into Court pending the outcome of this case, thus mooting any legitimate claim about payment *to* the Trustee. *See Bowne v. AmBase Corp.*, 161 F.R.D. 270, 274 (S.D.N.Y. 1995).

■ The Bankruptcy Code does not change New York law entitling the Trustee to obtain summary judgment irrespective of unrelated offsets. Cogan contends that Section 542(b) of the Bankruptcy Code governs the question. That section reads:

Except as provided in subsection (c) or (d) of this section, an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to,

or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

11 U.S.C. § 542(b). Yet this section merely refers to what rights, if any, exist under Section 553, 11 U.S.C. § 553. However, as Cogan concedes, Section 553 "does not create any setoff right; it merely preserves certain rights of setoff that exist under applicable nonbankruptcy law." 5 Collier on Bankruptcy, ¶ 553.04 (15th rev. ed.). Thus, even in bankruptcy proceedings, "a court may not employ the statute to enlarge a party's right of setoff" *Id.* State law setoff rights are "not affected by the Bankruptcy Code." *Citizens Bank v. Strumpf*, 516 U.S. 16, 20, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

Cogan also cites Bankruptcy Code § 363(e) which provides that when a trustee proposes that an interest in property be "used, sold or leased," the Court may attach certain conditions. However, the Trustee here seeks summary judgment on a debt; he does not seek to sell, use or lease anything. Cogan also points to New York Debtor & Creditor Law § 151 which recognizes that setoff rights exist. However, none of the cases Cogan cites address the discrete issue of whether summary judgment may be resisted on the basis of unrelated offsets. Although the Bankruptcy Code does not affect state law setoff rights, summary judgment on liability on the seven notes cannot be resisted on this ground.

***Summary Judgment is Granted to Dismiss the Offset Alleged Under the 1997 Renewal of the 1987 Employment Agreement, and as to Cogan's Defense to the May 1, 1998 Note, as Self–Dealing Transactions***

■ When a controlling shareholder or other insider engages in a self-dealing transaction that is not approved by an independent board (acting in accordance with certain standards), the transaction is unlawful unless the proponent thereof carries his burden of justifying it under the Delaware "entire fairness" doctrine. *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 763–66 (Del.Ch.1986).[1]

■ The "entire fairness" doctrine applies to self-dealing by a CEO concerning his own compensation and employment arrangements. *Delta Star, Inc. v. Patton*, 76 F.Supp.2d 617, 633 (W.D.Pa.1999) (applying Delaware law). As this Court recently noted, the Trustee's allegations—which have now been demonstrated on the summary judgment record—"are strikingly similar to the facts of *Delta Star*, in which a CEO was held liable for breach of fiduciary duty where he unilaterally determined his own salary increases and bonuses, and caused the adoption of generous retirement plan benefits, but failed to demonstrate the complete fairness of these transactions." *Pereira v. Cogan*, No. 00 Civ. 619, at p. 42 (S.D.N.Y. Mar. 8, 2001).

■ Under the "entire fairness" doctrine, a self-dealing transaction must be justified under both elements of "a two-pronged inquiry into the fair process and the fair price of the transaction." *Solomon v. Armstrong*, 747 A.2d 1098, 1112 (Del.Ch.1999), *aff'd*, 746 A.2d 277 (Del. 2000). The "burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Id.* at 1138 n. 39. Proponents of a self-dealing transaction are "required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." *Weinberger v. UOP, Inc.*,

---

**1.** Cogan does not dispute that the "entire fairness" test is the applicable legal standard.

457 A.2d 701, 710 (Del.1983). It must be noted, however, that the degree of difficulty of the task is not the standard for granting summary judgment. *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 54 (2d Cir.1998). This Court must draw every reasonable inference in Cogan's favor, *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir.1988), and the Trustee must show that Cogan has presented no genuine issue of material fact as to the issue.

### The Alleged Offset Under the 1997 Renewal of the 1987 Employment Agreement

■ Cogan contends that he is entitled to a $4.7 million offset, based on compensation allegedly due to him under the 1987 Employment Agreement, as renewed in 1997. Of this sum, $3.6 million related to contractual severance allegedly due because of the termination of his employment by reason of Trace's bankruptcy, and $1.1 million relates to the reduction of his alleged contractual compensation prior to Trace's Chapter 11 filing. This overall claim presumes the validity of the 1997 renewal of the 1987 Agreement. That renewal, however, is void as a self-dealing transaction which cannot be justified under Delaware law.

In attempting to meet his burden under the "entire fairness" test, Cogan has offered only two testimonials; from Cogan himself and defendant Robert Nelson, a former Cogan subordinate who was thus an interested director. This is not the type of evidence that suffices, under Delaware law, to satisfy the "entire fairness" standard.

In *Kahn v. Lynch Communication Sys.*, 638 A.2d 1110, 1115 (Del.1994), the Delaware Supreme Court addressed the question of "what type of evidence would be reliable to demonstrate entire fairness." It found that the answer had already been anticipated in its decision in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 709–10 n. 7 (Del. 1983) that "fairness in this context can be equated to conduct by a theoretical, wholly independent, board of directors." Similarly, as noted in *Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del.Ch.1986), "Without the guidance of a truly independent judgment, self-interested directors cannot with confidence know the right course in order to pursue it." Thus, "[f]air dealing . . . require[s] not reliance on such frail support as the defendants' own evaluation of their innocence of wrongdoing and on the fairness of [the transaction in question]." *Id.*

Cogan and Nelson have merely offered their views, as "interested" directors, or speculation about how the Trace board might have acted if it ever considered the 1997 renewal.[2] Cogan has presented no evidence of how a "wholly independent" board would have acted. Cogan has thus failed, as a matter of law, to meet his "entire fairness" burden.

For example, the Trustee established that the "price" of the 1997 renewal was far from entirely fair since: (a) the combination of heavy termination penalties and the 10–year term precluded the Board from exercising their *statutory* duties to supervise and evaluate the CEO and (b) the termination penalties were themselves unfair. One price of the agreement, as renewed, was effectively to insulate Cogan from any supervision by the Board of Directors, let alone discipline or removal, for the entire 10–year Renewal Term. In view of the severe financial penalties the re-

---

2. Cogan does not contend that the 1997 Trace board was disinterested. At least 4 of the five Board members were not disinterested—Cogan himself and 3 employee-subordinates, defendants Nelson, Farace and Marcus.

newed agreement would impose on the Board, the Agreement effectively prevented the Board from exercising any supervisory oversight. Similarly, if the Board made any meaningful changes in Cogan's duties, Cogan had the right to terminate the agreement for "Good Reason" and compel Trace to pay his $3.6 million annual salary for the entire remaining period of the 10–year term.

 Such insulation from Board supervision precludes satisfaction of the "entire fairness" burden. Directors have a statutory duty to manage their corporation, and agreements which "substantially encroach on the duty of directors to exercise independent judgment" in this regard are unlawful. *Abercrombie v. Davies*, 123 A.2d 893, 900 (Del.Ch.1956); *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281, 1291–92 (Del.1998); 8 Del. C. § 141(a). A fundamental part of this management responsibility entails the supervision and evaluation of a CEO. *See Lutz v. Boas*, 171 A.2d 381, 384, 395–96 (Del.Ch. 1961) (holding directors liable for the misdeeds of the "president and dominant figure" of the corporation when they failed to supervise his activities); *Volvovitz v. Protein Sciences Corp.*, CV 970057952S, 1997 WL 397464, *1, 1997 Conn.Super. LEXIS 1786, *3 (Conn.Super. Ct. June 26, 1997) ("The employment of the president of a corporation is a unique management function entrusted to the authority of the board of directors of a corporation."). Since the 1987 Agreement, as renewed in 1997, worked an independent illegality by substantially encroaching upon the Board's statutory duty to manage Trace, it cannot

be justified under the "entire fairness" standard.[3]

As a response, Nelson states that the Board would have been willing to pay the termination penalties and that, in his lay opinion, Trace could have avoided the $18 million obligation through refusing to pay and allowing Cogan to sue, defending on the grounds of the "cause" for termination. But this begs the question of whether a disinterested, prudent Board would have found a sustainable fairness justification for such an invasion of their statutory rights. *See Pereira v. Cogan*, March 8, 2001 Opinion at 35. Moreover, no prudent, independent Board could have relied upon the lay opinion of Nelson on legal issues. Additionally, his opinion of what the Trace Board might have thought fails the Rule 56(e) requirement of proving evidentiary facts.

More importantly, the "process" involved in the 1997 renewal was not "entirely fair" because (a) there was no process—the Board did not even consider the renewal issue—and (b) the 1997 events perpetuated continuing renewal procedures at odds with Delaware law. While the "fair process" or "fair dealing" element focuses on how board action was conducted, *In re Digex, Inc. Shareholders Litigation*, CCA No. 18336, 2000 WL 1847679, *24, 2000 Del. Ch. LEXIS 171, *90 (Del. Ch.2000), the Trace Board did not even consider whether or not to renew the Agreement. Cogan, himself, had the power to decide not to renew the 1987 Agreement. When a CEO sets the terms of his own employment, that is the epitome of a proscribed

---

**3.** The 1987 Agreement provides that it shall be governed by New York law. But since the present issue involves the governance of a Delaware corporation, and not contract law, Delaware law applies. In any event, the Agreement, as renewed, would also be illegal under New York law. *Rochester v. Bergen*,

265 A.D. 547, 548, 39 N.Y.S.2d 840 (2d Dept.), *aff'd.* 291 N.Y. 656, 51 N.E.2d 933 (1943) ("The directors of a corporation may not [via a 10–year employment contract] thus fetter in advance their discretion as to the selection and maintenance in office of the officers of a corporation.").

self-dealing transaction. *Delta Star,* 76 F.Supp.2d at 632–34.

■ Cogan's replies that since the original agreement was adopted by a "disinterested" Board in 1987, the captive Trace Board did not need to consider any of the foregoing. However, this argument runs afoul of a director's continuing duty to make currently informed decisions, *see e.g., Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985), and a properly functioning, independent Board could not assume that whatever happened a decade ago was still in the corporation's best interest.

Under Delaware law, a Board has to ratify a self-dealing transaction "by the affirmative votes of a majority of disinterested directors." 8 Del. C. § 144(a)(1) (2000). Here, the Agreement provided for the opposite: a self-dealing renewal was automatic unless vetoed by "not less than three-fourths of the entire membership of the Board," whether disinterested or not.

■ Cogan's remaining arguments fall short as well. Cogan contests the insolvency of Trace, but this does not raise a material issue for purposes of summary judgment. Self-dealing transactions are improper regardless of whether or not the corporation is solvent. Delaware cases commonly invalidate such transactions without reference to solvency. *See e.g., Weinberger,* 457 A.2d at 710–12; *Merritt,* 505 A.2d at 765–66; *Delta Star,* 76 F.Supp.2d at 624–25 (applying Delaware law). The Bank commitments referred to by Cogan in the time shortly before the 1997 renewal that contained covenants requiring Cogan to be in a position of control is not material because those provisions related to Cogan's stock ownership, not his position as CEO.

Cogan also makes the suggestion that shareholder ratification may still be sought. This suggestion is not tenable.

First, 8 Del. C. § 278, which is controlling, permits a dissolved corporation only to "close its affairs" and not to revisit "the business for which it was established." *Gamble v. Penn Valley Crude Oil Corp.,* 104 A.2d 257, 260 (Del.Ch.1954). A CEO's employment contract is obviously in the latter category. Second, there is no Board of Directors with the necessary authority to call a shareholder's meeting. Last, even if ratification were available in theory, Cogan offers no evidence that he could obtain the requisite majority of *disinterested* shareholders (*see Pereira v. Cogan,* March 8, 2001 Opinion at 46).

***The May 1, 1998 Note is Valid, and the February 19, 1999 Note Alleged by Cogan to Supersede It, is Void as a Self-Dealing Transaction***

Cogan asserts that he did not sign, nor did he authorize anyone else to sign the May 1, 1998 Note. Affidavits submitted by both Cogan and his attorney, Michael Schwartzbard ("Schwartzbard"), state that the disputed $3.722 million note was prepared in error, and when the error was discovered, the note was marked superseded. Cogan testifies further that he did not sign the note, nor did he authorize his signature to be affixed to it.

■ The first prong of Cogan's argument is that the Trustee cannot make his *prima facie* case because he cannot prove execution. Cogan contends that he neither signed, nor authorized his signature to be affixed to, the disputed note. The Trustee points out that under U.C.C. § 3–307(1)(b) all signatures are "presumed to be genuine or authorized" and this presumption cannot be overcome by a conclusory denial. U.C.C. § 3–307 cmt. 1 ("[U]ntil some evidence is introduced which would support a finding that the signature is forged or unauthorized the plaintiff is not required to prove that it is authentic. . ." Since such evidence is gen-

erally under the defendant's control, he is "required to make some sufficient showing of the grounds for his denial before the plaintiff is put to his proof.") It is incumbent upon a party claiming the nongenuineness of a signature to produce firsthand proof of the forgery. *Bradford Trust Company of Boston v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.Supp. 208, 211 (S.D.N.Y.1985) (*citing Freeman Check Cashing, Inc. v. State of New York*, Misc.2d 819, 97 Misc.2d 819, 412 N.Y.S.2d 963, (N.Y.Ct.Cl.1979)). One court has held that in order to maintain a meritorious defense on the issue of the validity of a signature, a defendant must state facts in his or her affidavit which are sufficient to support a finding that the signature was forged or unauthorized. *Burkett v. Finger Lake Development Corp.*, 32 Ill.App.3d 396, 336 N.E.2d 628, 18 UCCRS 435 (1975). Yet, as one commentator has noted:

> [t]here is an illusory simplicity to [this] definition. Consider the case in which the defendant wishes to raise the defense that he or she never signed the paper and had never authorized anyone to sign it for him or her. What can the defendant aver beyond the fact that he or she did not sign or authorize the signing of the paper? . . . On this basis, the validity of the defendant's signature should be deemed put at issue when the defendant pleads that he or she did not sign or authorize the signing of the paper *and there is apparently nothing more that the defendant could say.*

6 Anderson, *Uniform Commercial Code: Text, Cases, Commentary* § 3–307:22 (3d ed.1998) (emphasis added).

Here, Cogan has claimed that Schwartzbard was his attorney at the time of the May 1, 1998 note, and that the subject of Schwartzbard's representation encompassed matters such as that very note (*i.e.*

Cogan's "personal finances"). Schwartzbard admits that he furnished to Trace the *signed* copy of the May 1, 1998 Note, and that he "prepared" this *signed* copy of the note. Yet the affidavits of both Cogan and Schwartzbard aver nothing more than that Cogan did not sign, nor did he authorize anyone to sign, the May 1, 1998 note. As has been noted, "the validity of the defendant's signature should be deemed put at issue when . . . *there is apparently nothing more the defendant could say.*" Anderson (emphasis added). Here it is evident that more could be said. If Schwartzbard furnished and prepared the signed copy of the note, he must know the circumstances of the execution of the signature and the basis for the action taken, and if not, he must say so.

This is just such a case, as comment 1 to UCC § 3–307 points out, where evidence is in the defendant's control. Cogan is required to plead the invalidity of his signature as specifically as possible and he has failed to do so. U.C.C. § 3–307. Cogan has not adequately set forth the circumstances of the alleged invalidity of the execution to satisfy § 3–307, therefore, the note is deemed validly executed.

■ The second prong of Cogan's argument is that even if the note May 1, 1998 note is deemed executed, it was properly cancelled and a new obligation was executed in its place. Because the cancellation of the May 1, 1998 Note and the execution of the nonrecourse note, purportedly substituted on February 19, 1999 (the "February 19, 1999 Note") for the May 1, 1998 note, constitutes a *prima facie* self dealing transaction, which cannot satisfy the entire fairness test under Delaware law on this summary judgment record, the Trustee's motion for summary judgment as to this note is granted.

Cogan has submitted evidence that the May 1, 1998 note was cancelled in accor-

dance with U.C.C. § 3–605(1), which requires that the holder discharge the maker "in any manner apparent on the face of the instrument ... as by intentionally cancelling the instrument ... or ... by renouncing his rights be a writing signed and delivered or by surrender of the instrument to the party to be discharged." U.C.C. § 3–605(1). A copy of the original note, bearing Schwartzbard's markings to cancel it, is attached to his affidavit. Schwartzbard also testifies that he added the advances from the allegedly "superseded" note not covered by the $3 million nonrecourse note (the "February 19, 1999 Note") to a note he prepared later in 1998. Cogan contends that the May 1, 1998 Note was made in error[4] and the subsequent non-recourse note was executed in its place.

However, the February 19, 1999 Note contains no language that it is intended to substitute for, or otherwise cancel, Cogan's obligations under the May 1, 1998 Note. The parol evidence rule, which is applicable to negotiable instruments, would bar evidence of any alleged oral agreement to this effect. *See, e.g., National Bank of New York City v. ESI Group, Inc.*, 167 A.D.2d 453, 454, 562 N.Y.S.2d 136 (2d Dept.1990).

More importantly, however, the February 19, 1999 Note fails as a *prima facie* self-dealing transaction which does not satisfy the entire fairness requirement of Delaware law, and thus fails.

The only consideration Trace could conceivably have received in the February 19, 1999 nonrecourse note was the dividends from the pledged preferred shares. As discussed in the facts section, Cogan knew payment of such dividends was legally precluded. Furthermore, even if Trace could

have paid dividends, the amount thereof would have been of considerably less economic value than the moneys due under the May 1, 1998 note. Such failure of consideration would be grounds to invalidate the nonrecourse loan. *See, e.g., Workmen's Compensation Bd. v. King Metal Products, Inc.*, 29 Misc.2d 742, 219 N.Y.S.2d 449, 451 (Sup.Ct. Kings Co.1961), *aff'd*, 20 A.D.2d 565, 245 N.Y.S.2d 882 (2d Dep't 1963) ("It is academic that there can be no accord and satisfaction of a liquidated and undisputed sum simply by making a lesser payment.").

Finally, even if Trace was not disabled from paying dividends—a disability made permanent by its Chapter 7 bankruptcy—the nonrecourse note left Trace is a much worse position than it occupied under the May 1, 1998 note. Under the nonrecourse note, the dividend stream would (if paid) have forced Trace to wait for nine years, until early 2008, to recoup just its $3 million in principal, with no interest during that entire period. By contrast, under the May 1, 1998 note, Cogan was required to repay the $3 million, plus interest at a rate of 9 percent per annum, by December 1, 2003.

Cogan's substitution of, in effect, a zero obligation for a $3 million obligation is a *prima facie*, proscribed, self-dealing transaction by a controlling shareholder, under the authorities discussed. As such, Cogan has the extremely heavy burden of justifying the transaction under the "entire fairness" doctrine. Since Trace's rights were essentially eliminated under the nonrecourse note, Cogan cannot meet this burden on the present summary judgment record.

---

4. Cogan makes no attempt to argue the doctrine of mutual mistake, however, and on the present summary judgment record, such an argument would be unavailing. *See e.g., Chimart Assoc. v. Paul*, 66 N.Y.2d 570, 498 N.Y.S.2d 344, 489 N.E.2d 231 (1986).

For the same reasons detailed as to the 1997 renewal of the 1987 Employment Agreement, the cancellation of the May 1, 1998 Note and the issuance of a nearly valueless, non-recourse obligation, was an instance of self-dealing that cannot, on these facts, be justified under the entire fairness test required by Delaware law for such transactions.

### Summary Judgment is Granted to Dismiss Cogan's Alleged Offsets Under the 1985 Agreement

The Trustee seeks summary judgment, eliminating $12 million of Cogan's alleged offsets, which arise under agreements that pre-date the 1987 Employment Agreement, by relying on the merger clause in the 1987 agreement. That merger clause provides that "[a]ny and all" prior agreements between the parties "relating to the subject matter hereof ... are mutually terminated and cancelled." This merger clause was emphasized by a further sentence, going beyond the conventional language of such provisions, providing that it is "the intention of the Corporation and Mr. Cogan that this Agreement shall supersede and be in place of any and all prior agreements between them."

■■■ The effect of such merger clauses on prior written agreements presents an issue which New York Courts may, and do, decide as a matter of law. *Society for the Advancement of Education, Inc. v. Gannett, Co.*, 99 Civ. 2135, 1999 WL 33023, *4–8, 1999 U.S. Dist. LEXIS 700, *13–22 (S.D.N.Y. Jan. 20, 1999); *Citigifts, Inc. v. Pechnik*, 112 A.D.2d 832, 492 N.Y.S.2d 752 (1st Dep't 1985), *aff'd*, 67 N.Y.2d 774, 500 N.Y.S.2d 643, 491 N.E.2d 1100 (1986). The question presented to the Court is whether the 1987 agreement covers the same "subject matter" as the 1985 Agree-

ment with respect to "severance, retirement and death benefits" for which Cogan claims a $12 million offset. That question can be answered in the affirmative.

Severance is the "subject" of paragraph 17 of the 1987 Agreement. That provision goes into great detail about the payments to which Cogan would be entitled upon termination of his employment relationship, including, among other things, salary continuation payments.

Paragraph 11 of the 1987 Agreement is headed *"Retirement "* and details the financial benefits to which Cogan would be entitled upon his retirement from Trace. Thus, retirement is the "subject" of the 1987 Agreement.

Cogan's claim for retirement benefits under the 1985 Agreement is also impeached by the express terms of that (in any event superseded) document. Under that Agreement, the specified retirement benefits—a special $4 million pay-out—apply only upon "Employee's retirement at age sixty-five ..." Yet Cogan could not have worked for Trace any later that January 2000, when Trace went into Chapter 7 and Cogan was age 62. In addition, Cogan's claim for severance contradicts his alleged entitlement to the special retirement benefit, since severance applied in the case of "termination of employment for any reason other than death or retirement."

Nor can Cogan claim death benefits under the terms of that (in any event superseded) 1985 Agreement since he is still living. Furthermore, the claim adds nothing, since death benefits would simply permit the continued payment (to a beneficiary) of already claimed severance or retirement benefits.[5] In any event, death

---

**5.** By its terms, Cogan could not collect the retirement or death benefits provided by the

1985 Agreement. Therefore $8 million of his alleged $12 million offset is eliminated. Co-

benefits are the "subject" of both the 1985 and 1987 Agreements.

Cogan contends that the kinds of agreements that are barred by merger clauses, such as the one in the 1987 Agreement, are precisely those that would be barred by the parol evidence rule. *Primex International Corp. v. Wal–Mart Stores, Inc.*, 89 N.Y.2d 594, 600, 657 N.Y.S.2d 385, 388, 679 N.E.2d 624, 627 (1997) (prior agreement that does not vary or contradict subsequent agreement not barred by merger clause); *Exhibitgroup/Giltspur v. Spoon Exhibit Services*, 273 A.D.2d 874, 710 N.Y.S.2d 218, 219 (4th Dep't 2000) (merger clauses bar those agreements that were part of the negotiations that led to the final agreement, not separate written agreements that relate to independent transactions). However, merger clauses and the parol evidence rule bar any item that would vary or "add to" the agreement in question. *See, Fogelson v. Rackfay Constr. Co.*, 300 N.Y. 334, 337–40, 90 N.E.2d 881 (1950); *W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d 157, 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Investors Ins. Co. v. Dorinco Reins. Co.*, 917 F.2d 100, 104 (2d Cir.1990).

The survival of the 1985 Agreement would "add to" the payments provided in the 1987 Agreement and vary the Merger Clause's recitation that the 1987 Agreement "shall supersede and be in place of any and all prior arrangements or understandings." Cogan's statement of a contrary "intent" is similarly barred, since "the parties' intent must be found within the four corners of the document and question is one of law, which may be decided on a motion for summary judgment." *Gora v. D.I.D. Acquisition Co.*, 226 A.D.2d 425, 426, 641 N.Y.S.2d 59 (2d Dept.1996); *W.W.W. Assoc.*, 77 N.Y.2d at 162–63, 565 N.Y.S.2d 440, 566 N.E.2d 639; *Rainbow v.*

gan does not challenge the Trustee's argu-

*Swisher*, 72 N.Y.2d 106, 109, 531 N.Y.S.2d 775, 527 N.E.2d 258 (1988).

Cogan relies on the "Employee Benefits" paragraph of the 1987 Agreement to show that the two agreements do not cover the same "subject". The 1987 Agreement includes a section, entitled *"Compensation"*, which provides that, "Cogan shall be eligible to participate, fully and on a reasonable basis comparable to other executive officers, in any and all bonus, profit participation ... and other incentive or other compensation plans ... and all individual or group insurance, retirement, disability, salary continuation and other employee benefit programs." However, this provision merely preserves Cogan's right to participate "on a basis comparable to other executive officers" in various benefit programs, and has nothing to do with the special contractual agreement for Cogan under the 1985 Agreement.

It is dispositive that the "Employee Benefits" provision of the 1987 Agreement mandates that "Mr. Cogan's rights [under the 'Employee Benefits' plans] shall be governed by the terms thereof and shall not be enlarged hereunder of otherwise affected hereby." The 1987 Agreement would enormously "enlarge" Cogan's payments under the 1985 Agreement. Under the 1985 Agreement, Cogan was to be paid $4 million in severance in 120 equal monthly installments. If that agreement coexisted with the 1987 Agreement, such severance would be "enlarged" by additional "lump sum" payments under the latter. Similarly, as to retirement and death benefits, the same $4 million payout over 120 months would be "enlarged" by added payments under the 1987 Agreement. Therefore, the 1985 Agreement did not involve "Employee Benefits" plans that survived the 1987 Agreement.

ments on this issue.

The two agreements covered the same "subject matter" in terms of severance, retirement and death benefits. It is those subjects of the 1985 Agreement which are precluded by the Merger Clause. The fact that the two agreements were different on a separate subject, in that the latter agreement converted Cogan from an at-will employee into one with a fixed term is not determinative. Both agreements state it was their purpose to induce Cogan's continued employment, and the duplicative terms of his employment—the severance, death and retirement benefits provisions—cannot coexist.

The 1987 Agreement superseded the 1985 Agreement and rendered it a dead letter with respect to Cogan's alleged employee benefits thereunder.

### Cogan is Not Entitled to Relief Under Rule 56(F)

Cogan contends that he is opposing this motion without having full access to all of Trace's corporate books and records, which provide such evidence as minutes of meetings of the Board or the shareholders, or their resolutions or consents to various transactions, as well as correspondence and agreements with creditors and shareholders. Through such documents, Cogan would hope to establish that he create value in Trace, his continued control of Trace was crucial to its value, and he enjoyed the support of creditors and shareholders, thus establishing that the renewal of his employment agreement was entirely fair to Trace. This issue only addresses the "entire fairness" of the 1987 Agreement.

■ Even if Cogan "obtained what [he] stated he would be uncovered, the information would have been insufficient to defeat summary judgment." *Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy,* 891 F.2d 414, 422 (2d Cir.1989); *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138–39 (2d Cir.1994). Cogan merely seeks to augment factual contentions which do not create material issues, and he does not address dispositive issues such as the failure to present evidence of how an independent Board would have acted, the emasculation of the Trace Board's duties, and the lack of process consistent with Delaware law.

### Conclusion

For the reasons stated, summary judgment is granted with respect to the eight outstanding promissory notes as well as Cogan's claimed offsets under the 1997 renewal of the 1987 Employment Agreement. Summary judgment is also granted as to the alleged offsets under the 1985 Agreement.

It is so ordered.